IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JULIUS FULMORE,                    )
                                   )
          Plaintiff,               )
                                   )
     v.                            )     1:09-CV-373
                                   )
CITY OF GREENSBORO,                )
                                   )
          Defendant.               )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

Before the court is the motion to dismiss of Defendant City
of Greensboro ("the City") pursuant to Federal Rules of Civil
Procedure 12(b)(1) and 12(b)(6).  (Doc. 27.)  Plaintiff Julius
Fulmore ("Fulmore") opposes the motion.  (Doc. 30.)  The motion
has been fully briefed, and a hearing was held on May 6, 2011.
For the reasons set forth below, the motion will be granted in
part and denied in part.

**I.    BACKGROUND**

Fulmore  commenced  this  action  on  May  21,  2009,  and  is
proceeding currently on his Second Amended Complaint ("SAC").
(Doc. 23.)  For purposes of the current motion, the court views
all factual allegations in the light most favorable to Fulmore
as the non-moving party.  See Ibarra v. United States, 120 F.3d
472, 474 (4th Cir. 1997).

Fulmore is an African-American/black police officer employed by the Greensboro Police Department ("GPD") since 1984. He has worked in various GPD units, including the Vice and Narcotics Department, the Traffic Enforcement Department, the Violent Crime Organized Crime Drug Enforcement Task Force, and the Special Intelligence Division ("SID").

In 2003, David Wray ("Wray") became the GPD police chief. Fulmore alleges that Wray "created and developed a pattern and practice of investigating and disciplining black officers, including Officer Fulmore, more harshly, and paying and promoting black officers, including Officer Fulmore, less favorably, than white officers." (Doc. 23 ¶ 38.)

Historically, criminal investigations of GPD officers were carried out by the Criminal Investigative Division ("CID") pursuant to clear guidelines and standards, and administrative investigations of GPD officers were performed by the Internal Affairs Division ("IA"). Fulmore alleges that Wray continued these practices only for investigations of non-black officers and bypassed them for investigations of black officers, which he assigned to Officer Scott Sanders ("Sanders"), an SID investigator. Wray required SID officers to report directly to deputy chief Randall Brady ("Brady"), immediately below Wray. Brady allegedly authorized Sanders to report directly to him, instead of to the SID sergeant. Thus, Sanders effectively

operated outside the normal chain of command. Wray, Brady, and Sanders are all white.

According to Fulmore, Sanders reinvestigated allegations against black GPD officers that previous investigations had shown to be false or unfounded. Fulmore alleges that such actions were not taken against non-black officers and that the GPD aimed "to destroy the reputations of black GPD officers," "to prevent them from receiving promotions, meritorious assignments, pay raises and other [compensation]," and "to terminate and or [sic] imprison black GPD officers." (Id. ¶¶ 66-67.)

In or around 2003, Wray and Brady allegedly directed Sanders to create a photo lineup containing pictures of five black GPD officers, including Fulmore. The photos were shown to criminals or suspects from 2003 through 2005 in an effort to elicit false allegations of improper conduct by Fulmore. The GPD also allegedly created a digital photo array of all black GPD officers, which Sanders kept on his department-issued computer and showed to criminals or suspected criminals. Fulmore alleges that both photo arrays were used to facilitate discriminatory investigations against him from 2003 through 2005.[1]

_____

[1] The SAC alleges that another photo array was created around February 2005 as part of a lineup book featuring photos of black GPD officers.

In the fall of 2003, Pamela Williams ("Williams"), an inmate in the Guilford County Jail, accused Fulmore of involvement with a drug dealer. This led to an investigation by the GPD, the Guilford County Sheriff's Department, and the North Carolina State Bureau of Investigation ("SBI"). Allegedly due to Fulmore's race, Wray and Brady directed Sanders to conduct the GPD's investigation of Fulmore. The SBI quickly discredited Williams' allegations as baseless, but Sanders continued his investigation with the authorization of Wray and Brady, despite concerns expressed by the SBI.

Around December 2003, Sanders allegedly purchased a key catcher, which he secretly installed on Fulmore's GPD-issued computer to record all keystrokes by its user. The key catcher collected the passwords to Fulmore's official and personal email accounts, which Sanders then searched. Sanders also searched a laptop computer temporarily provided to Fulmore by the United States Department of Housing and Urban Development. These searches did not lead to any administrative or criminal charges against Fulmore, were allegedly in violation of preexisting

---

This lineup book allegedly was used to elicit false allegations against black officers. The SAC does not state whether Fulmore's photo was included in this book, but the attached EEOC Intake Questionnaire states that Fulmore's "job photo was placed in a 'Black Book' and shown to unlikely people without just cause." (Doc. 24 at 3. Compare Doc. 26-2 at 3 (indicating that a "Black Book" did not contain Fulmore's photo), with Doc. 26-3 at 1 (indicating that a "Black Book" may have contained Fulmore's photo).) The term "Black Book" has allegedly been used to describe each of the photo arrays created by Sanders.

policies of the City and the GPD, and were allegedly conducted because of Fulmore's race. Around January 2004, Wray, Brady, and Sanders placed a GPS tracking device on Fulmore's police vehicle, which also never led to any charges against Fulmore. Fulmore alleges that no non-black officer was treated in such a manner. Although an analysis of Fulmore's phone records by the SBI in early 2004 established that Williams' allegations were false, the GPD continued its investigation of Fulmore through the first half of 2004.

On June 2, 2004, Fulmore rented a hotel room for an acquaintance named Greg Lewis ("Lewis"), who spent the night there with an associate. After learning that Fulmore had rented the room, Sanders searched it, although he had no evidence of any criminal conduct by Fulmore at the hotel. Drug paraphernalia and a used condom were found in the room. Contrary to GPD protocol, Sanders did not treat the room as a crime scene, call the IA Commander or a CID officer to the scene, or take photographs of the location of the evidence. Fulmore alleges that these violations were due to his race. Sanders also searched an adjacent room rented by known drug user and prostitute Brenda Weidman ("Weidman"), discovered drug paraphernalia, and arrested her. Weidman first told the GPD that she was unaware Fulmore had rented the room next door, but she then changed her story to say that she had smoked crack and

had sex with him the night before. Fulmore denied these charges, and Lewis corroborated Fulmore's story by admitting possession of the drug paraphernalia and stating that Fulmore had no knowledge of the paraphernalia and did not smoke crack at the hotel.

Fulmore was suspended on administrative leave from early June 2004 to March 2005 and investigated criminally and administratively. When interviewed again by the GPD, Weidman contradicted her earlier statements concerning Fulmore, and a DNA test of the used condom found in Lewis' room corroborated Fulmore's earlier statements.

During his suspension, Fulmore worked at his auto body shop. The GPD allegedly directed various people to attempt to sell him stolen property at his shop, in an effort to frame him. The GPD's efforts, however, were unsuccessful.

When the investigations into Weidman's allegations were completed in March 2005, Fulmore was exonerated of all alleged crimes, although he was cited for the administrative violation of failing to document Weidman as an informant. As punishment for this violation, Fulmore was reassigned to patrol division. Fulmore alleges that no non-black GPD detective has ever been reassigned to patrol division from an investigative division for failure to document an informant, a common occurrence in the GPD, and that the true reason for his reassignment was his race.

Thereafter, Brady directed Sanders to continue investigating Fulmore, even though all prior allegations against him had been resolved. This new round of investigation allegedly lasted from March 2005 through the rest of the year and involved the GPD's surveillance of Fulmore though a private detective.

On August 1, 2005, Fulmore submitted an Intake Questionnaire to the United States Equal Employment Opportunity Commission ("EEOC"), alleging racial discrimination by the City. (Doc. 24.) He "intended the EEOC to take prompt action against the City when he completed his [I]ntake [Q]uestionnaire." (Doc. 23 ¶ 226.)

On November 11, 2005, the City hired law enforcement consultant Risk Management Associates of Raleigh ("RMA") to evaluate problems within the GPD. Following an investigation that included fifty-two interviews of GPD officers and related personnel, RMA issued a report ("RMA Report") on December 11, 2005,[2] allegedly finding that "the GPD engaged in a number of illegal and or [sic] improper practices," including "disparate treatment of African-Americans," "the appearance of racial targeting/discrimination," and "failure to follow procedures." (Id. ¶¶ 234-35.) The RMA Report is attached to the SAC and

---

[2] Although the SAC alleges that RMA was retained on November 11, 2005, and issued the RMA Report on December 11, 2005 (Doc. 23 ¶¶ 230, 234), the RMA Report itself is dated December 19, 2005 (see, e.g., Doc. 25 at 2) and indicates that RMA was retained prior to November 11, 2005 (see id. at 8).

incorporated therein by reference. (Doc. 25.) In response to the RMA Report, the City allegedly accepted the resignations of Wray and Brady.

Fulmore alleges that the EEOC delayed in preparing his Charge of Discrimination ("Charge") until June 1, 2006. Once the Charge was signed and filed, the EEOC conducted an investigation and determined that Fulmore had experienced discrimination. (Doc. 23 ¶ 249; see Doc. 26-3.) The EEOC referred his case to the United States Department of Justice, and Fulmore received a "Right to Sue Letter" (Doc. 26-5) on March 3, 2009. Within the required 90 days, Fulmore commenced this action against the City for discrimination on the basis of race in violation of Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. § 2000e et seq. ("Title VII") (Count I) as well as 42 U.S.C. §§ 1981 and 1983 (Count II).

## II. ANALYSIS

### A. Standard for Rule 12(b)(6) Motions

The purpose of a motion under Federal Rule of Civil Procedure 12(b)(6) is to "test[] the sufficiency of a complaint" and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). In considering a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint,"

Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the plaintiff's favor, Ibarra, 120 F.3d at 474.

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Although the complaint need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957), abrogated on other grounds by Twombly, 550 U.S. 544), a plaintiff's obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do," id. Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegations "to raise a right to relief above the speculative level" so as to "nudge[] the[] claims across the line from conceivable to plausible." Id. at 555, 570; see Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-51 (2009).

Employment discrimination claims carry no heightened pleading standard, see Twombly, 550 U.S. at 569-70, nor must an employment discrimination complaint contain specific facts establishing a prima facie case, Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510-11, 515 (2002). Yet the Fourth Circuit has not interpreted Swierkiewicz as removing the burden of a

plaintiff to plead facts sufficient to state all the elements of his claim. Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 764-65 (4th Cir. 2003) (holding that the plaintiff failed to allege facts sufficient to support all the elements of her hostile work environment claim); see also Jordan v. Alt. Res. Corp., 458 F.3d 332, 346-47 (4th Cir. 2006) (affirming the dismissal of a 42 U.S.C. § 1981 discrimination claim because the complaint did not allege facts supporting the assertion that race was a motivating factor in the plaintiff's termination).

## B.    42 U.S.C. §§ 1981 and 1983 (Count II)

"[W]hen suit is brought against a state actor, § 1983 is the 'exclusive federal remedy for violation of the rights guaranteed in § 1981.'" Dennis v. Cnty. of Fairfax, 55 F.3d 151, 156 (4th Cir. 1995) (quoting Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 733 (1989)). Because the requirements of 42 U.S.C. § 1983 must therefore be satisfied for a 42 U.S.C. § 1981 claim to prevail, id., Fulmore has properly brought this claim as "a claim under 42 U.S.C. § 1983 for a violation of 42 U.S.C. § 1981" (Doc. 30 at 1).

This claim rests entirely upon the allegedly wrongful actions of Wray, Brady, Sanders, and other GPD employees. However, a municipality cannot be held liable under § 1983 on a respondeat superior theory. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691-92 (1978). Rather, "[t]o state a cause of action

against a municipality, a section 1983 plaintiff must plead (1) the existence of an official policy or custom; (2) that the policy or custom is fairly attributable to the municipality; and (3) that the policy or custom proximately caused the deprivation of a constitutional right." Pettiford v. City of Greensboro, 556 F. Supp. 2d 512, 530 (M.D.N.C. 2008) (citing Jordan ex rel. Jordan v. Jackson, 15 F.3d 333, 338 (4th Cir. 1994)). Municipal policy can be found in (1) written ordinances and regulations, (2) affirmative decisions of policymaking officials, or (3) omissions by policymaking officials "that manifest deliberate indifference to the rights of citizens." Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999). A municipal custom may arise "if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" Id. (quoting Monell, 436 U.S. at 691).

The City contends that Fulmore's § 1983 claim should be dismissed because the SAC does not allege facts plausibly supporting the existence of a municipal policy or custom pursuant to which the alleged racially discriminatory actions were taken against Fulmore by various GPD employees. Fulmore responds that (1) Wray and Brady had policymaking authority in connection with the actions allegedly taken against Fulmore and

(2) a municipal custom arose due to the City's alleged knowledge of and indifference to the events taking place within the GPD.

## 1.    Municipal Policy

Fulmore asserts in the SAC that "Wray was the person empowered by the City to establish the City's, and the GPD's official policies and customs with regard to employment practices within the GPD and to conduct of investigations conducted by the GPD." (Doc. 23 ¶ 34.)  Fulmore claims that Brady had these same powers "in the absence of the Chief of Police." (Id. ¶ 49.)  Therefore, Fulmore argues, the alleged racially discriminatory actions taken or authorized by Wray and Brady constituted (or were pursuant to) municipal policy.

However, in Greensboro Professional Fire Fighters Ass'n, Local 3157 v. City of Greensboro, 64 F.3d 962 (4th Cir. 1995), the Fourth Circuit held that under the Greensboro City Ordinance "only the City Manager and the City Council possess the authority to fashion policy with regard to employer-employee relations in all city departments." Id. at 965 (emphasis in original).  The court further held that although the Greensboro Fire Chief had final decisionmaking authority to appoint captains and to establish procedures for those appointments, he did not have "policymaking" authority.[3] Id. at 965-66.  Rather,

---

[3]    The question whether an individual possesses final policymaking authority is a matter of state law.  See Crowley v. Prince George's

the Fire Chief's powers were "always subject to the parameters established by the City." Id. The court cautioned against confusing "the authority to make final *policy* with the authority to make final implementing *decisions*." Id. at 966 (emphases in original); see also Robinson v. Balog, 160 F.3d 183, 190 (4th Cir. 1998) ("The fact that [the director of the Baltimore Department of Public Works] had the power to choose whom to hire, promote, discharge, and transfer within the department he directed simply cannot establish that he had the broader authority to craft municipal policy.").

The City contends that Fire Fighters Ass'n controls and defeats Fulmore's municipal policy theory. Fulmore makes three arguments in response. First, he emphasizes that Fire Fighters Ass'n was a summary judgment decision and asserts that "[t]he Fourth Circuit does not, at any point in that decision, hold as a matter of law that the Fire Fighters' claims were precluded, but instead that the Fire Fighters did not have sufficient evidence to prove their claims." (Doc. 30 at 5.) He argues that the opinion is not applicable to a Rule 12(b)(6) motion to dismiss, because the sufficiency of the evidence is not relevant at this stage.

_____

Cnty., Md., 890 F.2d 683, 685 (4th Cir. 1989) (citing City of St. Louis v. Praprotnik, 485 U.S. 112, 124 (1988) (plurality opinion)).

This court recently rejected an identical argument in Alexander v. City of Greensboro, 762 F. Supp. 2d 764, 782-83 (M.D.N.C. 2011). Contrary to Fulmore's assertion, the Fourth Circuit held in Fire Fighters Ass'n that under "[t]he relevant state and city laws," only the Greensboro City Manager and the City Council possess final policymaking authority as to employer-employee relations within city departments. 64 F.3d at 965. This was a legal determination based upon an examination of the Greensboro City Ordinance, see id., and the holding is controlling here. The Fourth Circuit went on to state that "[t]here is no evidence in the record that the City Council or the City Manager had delegated any of its policymaking authority with regard to employer-employee relations to the Fire Chief." Id. Fulmore is correct that at this stage he need not present evidence establishing that Wray and Brady were delegated final policymaking authority by the City Council or City Manager, but he must allege facts plausibly indicating that such delegation took place. Cf. Yadin Co. v. City of Peoria, No. CV-06-1317, 2008 WL 906730, at *5 (D. Ariz. Mar. 25, 2008) (dismissing § 1983 claim for lack of factual allegations supporting plaintiff's assertion that a city official had final policymaking authority or had been delegated such authority); Lyttle v. Killackey, 528 F. Supp. 2d 818, 828-29 (N.D. Ill. 2007) (finding complaint defective for failure to plead facts

14

supporting conclusory assertion that final policymaking authority was delegated to police officers), <u>reconsidered on other counts</u>, 546 F. Supp. 2d 583 (N.D. Ill. 2008).

Next, Fulmore argues that his SAC adequately alleges that final policymaking authority was delegated to Wray and Brady, and he contends that the SAC is therefore distinguishable from the complaint in <u>Alexander</u>, in which the court dismissed § 1983 claims that relied partly upon inadequate allegations that Wray and Brady were final policymakers. <u>See</u> 762 F. Supp. 2d at 781-84. Fulmore's SAC asserts that "[u]pon information and belief, the City, via policymakers including the City Manager, the City Council and or [sic] other appropriate officials, delegated or acquiesced policy making authority to Wray and Brady to create and implement the official policies, widespread customs, and practices that led to the Discriminatory Acts." (Doc. 23 ¶ 259.) It also alleges that "Wray was the person empowered by the City to establish the City's, and the GPD's official policies and customs with regard to employment practices within the GPD" (<u>id.</u> ¶ 34) and makes a similar statement about Brady (<u>id.</u> ¶ 49).

These allegations are conclusory and lack any factual support in the SAC. Other district courts have found such bare-bones allegations insufficient under <u>Twombly</u>'s plausibility standard. <u>See</u> <u>Yadin Co.</u>, 2008 WL 906730, at *5; <u>Lyttle</u>, 528 F.

Supp. 2d at 828-29. Moreover, the factual allegations actually included in the SAC indicate that Wray and Brady did *not* possess final policymaking authority. For example, according to the SAC, the contract between the City and RMA stated that RMA was hired to ensure "that the performance and practices of the Police [D]epartment are in compliance with all applicable laws[,] performance standards, best policing practices, the [D]epartment's own policies and practices *as well as the City's*." (Doc. 23 ¶ 231 (emphasis added).) If the operations of the GPD, under the direction of Wray and Brady, were subject to review by the City to ensure that they were in line with municipal policy, it follows that Wray and Brady did not have final authority to establish municipal policy. See <u>Riddick v. Sch. Bd.</u>, 238 F.3d 518, 523-24 (4th Cir. 2000) (holding that where an official's acts are subject to review or supervision by a municipal policymaker, that official does not have final policymaking authority). This conclusion is supported by other allegations in the SAC (<u>see, e.g.</u>, Doc. 23 ¶ 110 ("Sander's [sic] use of Officer Fulmore's passwords to search his email accounts [allegedly authorized by Wray and Brady] violated pre-existing established policies of the City . . . .")) and in the attached RMA Report (<u>see, e.g.</u>, Doc. 25 at 9 ("The department head, in this case the police chief, . . . is accountable to the City Manager . . . .")).

Finally, Fulmore argues that Fire Fighters Ass'n only addressed final policymaking authority for *employment* decisions, while Fulmore's allegations also involve policies "regarding the active use and deployment of law enforcement personnel and law enforcement resources." (Doc. 30 at 7.) The SAC alleges that "Wray was the person empowered by the City to establish the City's, and the GPD's official policies and customs with regard to . . . conduct of investigations conducted by the GPD." (Doc. 23 ¶ 34.) It also alleges that Brady had this same power "in the absence of the Chief of Police" and was "empowered by the City to establish the City's and the GPD's official policies and customs with regard to the activities and functions of the SID." (Id. ¶¶ 49-50.)

These allegations are no less conclusory and bare-bones than those discussed previously. Fulmore points to no statute, ordinance, or regulation bestowing final policymaking authority upon the GPD Chief or Deputy Chief in connection with any of the non-employment-related matters alleged, nor does he allege any specific facts indicating that such authority was delegated to Wray or Brady. To the contrary, as noted above, allegations in the SAC and the attached RMA Report indicate that Wray and Brady did *not* possess final policymaking authority as to any of the matters at issue in this action, employment-related or otherwise. (See, e.g., id. ¶¶ 110, 231; Doc. 25 at 9.)

Fulmore's argument is also contrary to the Greensboro City Charter which, as noted in Alexander, provides in part: "The chief of police, *acting under the city manager*, shall have supervision and control of the police force and shall enforce discipline therein." 762 F. Supp. 2d at 783 (emphasis added) (quoting Greensboro, N.C., Charter § 4.31).

Therefore, Fulmore has failed to plausibly allege a municipal policy upon which to base his § 1983 claim.[4]

## 2. Municipal Custom

Fulmore contends that his SAC alleges a municipal custom sufficient to establish municipal liability under § 1983. He claims that his allegations plausibly indicate that by June 2005 (at the latest) the City Manager and other City officials were aware of the alleged racial discrimination within the GPD but that the City took no action until December 2005 when the RMA Report was issued. Fulmore argues that this alleged

_____

[4] At the May 6, 2011, hearing, Fulmore's counsel made an additional argument, pointing to the complaint in a pending suit brought against the City by Wray. (See Case No. 1:09-CV-95, Doc. 3.) The complaint alleges that when Wray became Chief, then-City Manager Ed Kitchen ("Kitchen") discussed with Wray "the perception within the Greensboro Police Department that integrity and high standards had deteriorated under [the prior Chief] and Ed Kitchen's expectation that as Chief, David Wray would need to take appropriate steps to restore the integrity and high standards that were maintained [before the prior Chief's tenure]." (Id. ¶ 9.) To the extent Fulmore argues that this constitutes an allegation that Kitchen delegated policymaking authority to Wray, Fulmore's municipal policy argument still fails, because an exhortation "to restore . . . integrity and high standards" does not constitute an authorization to make final municipal policy.

indifference to a widespread, pervasive custom of racial discrimination renders the City liable under § 1983.

To establish municipal liability for a widespread illegal custom or usage among the City's police force, Fulmore must show (1) that the City had "'actual or constructive knowledge' of the custom and usage by its responsible policymakers," and (2) that there was a failure by those policymakers, "'as a matter of specific intent or deliberate indifference,' to correct or terminate the improper custom and usage." Randall v. Prince George's Cnty., Md., 302 F.3d 188, 210 (4th Cir. 2002) (quoting Spell v. McDaniel, 824 F.2d 1380, 1391 (4th Cir. 1987)). Fulmore has not alleged facts plausibly satisfying these requirements.

The SAC states that the City Manager and City Council "had both actual and constructive knowledge of the Discriminatory Acts and of the official policies, widespread customs, and practices that led to the Discriminatory Acts" (Doc. 23 ¶ 260), that they "could have reasonably foreseen the official policies, widespread customs and practices implemented by Wray and Brady would lead to the Discriminatory Acts" (id. ¶ 261), that they "condoned and or [sic] were deliberately indifferent to the Discriminatory Acts and the official policies, widespread customs and practices implemented by Wray and Brady that led to the Discriminatory Acts" (id. ¶ 262), and that they "failed to

correct the official policies, widespread customs and practices that led to the Discriminatory Acts despite their actual and constructive knowledge of such policies and customs" (id. ¶ 263).  These assertions are conclusory and are not supported by specific factual allegations.

To the contrary, Fulmore's specific factual allegations lead to the opposite conclusion.  According to the RMA Report attached to the SAC, when the GPD's surveillance of a black officer — Lieutenant James Hinson ("Hinson") — became public in early June 2005, the City Manager and City Council members requested an explanation from Wray.  (Doc. 25 at 4.)  Wray reported to the City Manager, Deputy City Manager, and City Attorney that Hinson was suspected of association with a narcotics smuggling organization.  (Id. at 5 (stating that Wray linked Hinson to "bodies in refrigerators" and "a violent, international drug cartel").)  The City Manager relayed this information to the City Council to assure them that concerns raised about possible abuse of power by the GPD leadership were unjustified.  (Id.)  The RMA Report states that Wray continued to falsely assure the City Manager and Deputy City Manager that Hinson's participation in the smuggling organization was recent and justified investigation of him.  (Id. at 6; see id. at 29 (concluding that Wray was "misleading and deceptive" in his reports to the City Manager).)

However, when the City Manager was approached "[s]hortly thereafter" by "a contingent of minority police officers" who complained of "disparate treatment," discriminatory investigations by a "secret police" unit, and the use of a "black book" containing photos of black police officers, the Interim City Manager interviewed the Assistant Special Agent-in-Charge of the SBI regarding these matters and directed the City Attorney to conduct an investigation. (Id. at 6.) By mid-October 2005, the City Attorney's office had interviewed approximately forty GPD employees and other relevant persons, and the investigation had uncovered "additional issues of concern regarding the management of the police department." (Id. at 7.) As a result, the City Manager directed the City Attorney "to locate and retain an independent investigative body with law enforcement operational and procedural expertise to assist in the continued effort to determine the facts and circumstances surrounding these issues." (Id.) RMA was retained, and on November 11, 2005, it issued a report to the City Attorney. (Id. at 8.) The scope of work requested of RMA was then expanded, and RMA issued a final report on December 19, 2005. (Id.) During its investigation, "[t]he RMA team . . . worked closely with the assigned City of Greensboro personnel to coordinate [their] efforts and to provide a thorough and objective review for consideration." (Id. at 2.)

These allegations, together with the City's subsequent acceptance of Wray's and Brady's resignations (Doc. 23 ¶ 238), are inconsistent with and in fact belie Fulmore's conclusory assertion that the City permitted a known custom or usage of racial discrimination within the GPD to continue and fester as a matter of specific intent or deliberate indifference between June 2005 and December 2005. Fulmore argues that "[d]iscovery may, in fact, show knowledge and acceptance by the City [of the alleged racial discrimination] since 2003 or before" (Doc. 30 at 8 n.3), which might indicate deliberate indifference between 2003 and June 2005. However, this statement is purely speculative, is not supported by factual allegations in the SAC, and is undercut by the RMA Report's statement, upon which Fulmore relies, that "it is Chief David Wray who is accountable for the deception and misleading response to the events *in early June [2005]* that brought [the actions of the special GPD unit allegedly investigating black officers] *to the attention of the City Manager* and citizens of Greensboro." (Doc. 25 at 27-28 (emphases added).) Even taken in the light most favorable to Fulmore, the factual allegations in the SAC and the attached documents do not plausibly support a reasonable inference of a municipal custom of discrimination against black police officers resulting in liability for the City under § 1983.[5]

---

[5]    Fulmore also asserts that "to this day, [he] continues to be

Because Fulmore has not alleged facts plausibly supporting the existence of a municipal policy or custom, his § 1983 claim for violation of his rights under § 1981 will be dismissed.[6]

## C.   **Title VII (Count I)**

Fulmore asserts a claim of racial discrimination in employment in violation of Title VII under multiple theories. The City raises several grounds upon which it contends Fulmore's Title VII claim should be dismissed: (1) Fulmore's EEOC Charge was untimely filed; (2) Fulmore does not allege facts plausibly supporting his theories of discrimination; (3) the City is entitled to the defense of laches; and (4) Fulmore's Title VII allegations exceed the scope of his Charge.   Each of these issues will be analyzed in turn.

---

affected by the racial discrimination."   (Doc. 30 at 8.)   To the extent this is an argument that the City has shown deliberate indifference to racial discrimination in the GPD *since* 2005, it is unpersuasive.   The allegations Fulmore points to are conclusory statements indicating that he may still suffer from the effects of the earlier alleged discrimination.   (See Doc. 23 ¶¶ 268-70, 283-85.) These allegations in no way indicate an ongoing municipal custom.

Similarly, Fulmore's attached Charge, signed on June 1, 2006, states that "since January 2006, [he has] filed numerous complaints with the Internal Affairs Division [of the GPD] concerning various incidents, which lead [him] to believe that [he is] a subject of surveillance and is part of the continuing harassment and intimidation.   In spite of Departmental policies and procedures, [his] complaints have not been investigated or resolved."   (Doc. 26 at 1.) This statement is not mentioned in the SAC or Fulmore's brief and is unaccompanied by any factual details.   Fulmore does not allege that the City had knowledge of this asserted post-2005 harassment, so in light of the specific allegations of City action discussed previously, Fulmore's Charge does not plausibly indicate the existence of a municipal custom of racial discrimination.

[6]   Because of this holding, it is unnecessary to address the City's statute-of-limitations argument.

### 1. Timeliness of Fulmore's Charge

The City first contends that Fulmore's Title VII claim should be dismissed because he failed to timely file his Charge of Discrimination with the EEOC. To file a claim under Title VII in federal court, a plaintiff must first exhaust his administrative remedies by filing a timely charge of discrimination with the EEOC. Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 132 (4th Cir. 2002). Title VII mandates that a plaintiff must file this threshold charge of discrimination with the EEOC within 180 days of the alleged discriminatory act. 42 U.S.C. § 2000e-5(e)(1); EEOC v. Commercial Office Prods. Co., 486 U.S. 107, 110 (1988).[7] Failure to timely file a charge with the EEOC bars the claim in federal court, McCullough v. Branch Banking & Trust Co., 35 F.3d 127, 131 (4th Cir. 1994), and courts have strictly enforced this requirement, Tangires v. Johns Hopkins Hosp., 79 F. Supp. 2d 587, 597 (D. Md. 2000), aff'd, 230 F.3d 1354 (4th Cir. 2000) (per curiam) (unpublished table decision). Even claims alleging a continuous violation of Title VII must allege a discriminatory act committed within the limitations period, Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117-18 (2002), and "discrete discriminatory acts are

---

[7] If North Carolina were a "deferral state," the time period would be 300 days. See 42 U.S.C. § 2000e-5(e)(1). However, North Carolina is a deferral state only in limited circumstances not applicable here. See Bratcher v. Pharm. Prod. Dev., Inc., 545 F. Supp. 2d 533, 539-43 (E.D.N.C. 2008).

not actionable if time barred, even when they are related to acts alleged in timely filed charges," id. at 113.

Fulmore correctly points out that an untimely filed charge is not a jurisdictional bar. See Jones v. Calvert Grp., Ltd., 551 F.3d 297, 300 & n.2 (4th Cir. 2009) (citing Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982)). Rather, the timely filing requirement is "like a statute of limitations, . . . subject to waiver, estoppel, and equitable tolling." Zipes, 455 U.S. at 393. The court therefore analyzes this issue under Rule 12(b)(6), rather than under Rule 12(b)(1) as the City appears to argue (see Doc. 9 at 10-11). Cf. Shepard v. Lowe's Food Stores, Inc., No. 1:08-CV-679, 2009 WL 4738203, at *2 (M.D.N.C. Dec. 7, 2009) (treating defendant's Rule 12(b)(1) motion to dismiss for failure to file suit within 90 days of receiving a "Right to Sue Letter" as a Rule 12(b)(6) motion).

Fulmore does not attempt to argue that his Charge was timely. He signed his Charge on June 1, 2006. (See Doc. 26 at 1.) Filing on this date barred any claims based on acts that occurred before December 3, 2005 — 180 days earlier.[8] However, virtually all the discrimination alleged in the SAC took place

---

[8] The City states that the Charge was not filed until June 6, 2006 (Doc. 9 at 2-3, 13), apparently basing this date on the stamp found on Fulmore's Charge (see Doc. 26 at 1). However, it appears that the stamp actually reads "6 JUN -1," that is, June 1, 2006, consistent with the date of signing. Regardless, a five-day difference would have no effect upon the result in this case.

before December 3, 2005.[9]  For example, Fulmore's alleged discriminatory suspension began in early June 2004 (Doc. 23 ¶ 181), more than 700 days before he filed his Charge.  Thus, unless Fulmore can find an exception on another ground, he has failed to timely exhaust his administrative remedies for most of the discrimination he alleges.

Fulmore makes two arguments in support of his position that his claims are not time barred: (1) the doctrine of equitable tolling should apply because the delayed filing of the Charge was due to the fault of the EEOC; and (2) his EEOC Intake Questionnaire, submitted on August 1, 2005, constituted a sufficient charge of discrimination.  The City opposes both of these arguments.

### a.  Equitable Tolling

Fulmore argues that the 180-day limitations period should be equitably tolled from the date of his Intake Questionnaire to the date of his formal Charge.  He contends that the delay was the fault of the EEOC, which delayed in preparing his formal Charge.[10]  He argues that the delay was thus beyond his control

---

[9]  Fulmore's only allegations of discrimination after December 3, 2005, are found in the Charge itself.  (See Doc. 26 at 1.)

[10]  See generally Fed. Express Corp. v. Holowecki, 552 U.S. 389, 418 (2008) (Thomas, J., dissenting) (stating that "[c]harges are . . . typically completed and filed by the agency, not the complainant"); Edelman v. Lynchburg Coll., 535 U.S. 106, 115 n.9 (2002) ("The general practice of EEOC staff members is to prepare a formal charge of

26

and he should not be held responsible for it. Therefore, he contends, all claims based on acts on or after February 2, 2005 — 180 days before the submission of the Intake Questionnaire on August 1, 2005 — are timely. Although the City did not address this issue in its briefs, counsel for the City contended at the hearing that equitable tolling is not justified.

Equitable doctrines such as equitable tolling "are to be applied sparingly." Morgan, 536 U.S. at 113; see Baldwin Cnty. Welcome Ctr. v. Brown, 466 U.S. 147, 152 (1984) (per curiam) ("Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants."). Equitable tolling is generally not permitted "where the claimant failed to exercise due diligence" and it does not extend to "garden variety claim[s] of excusable neglect." Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990). The doctrine, however, "has been applied in two generally distinct kinds of situations. In the first, the plaintiffs were prevented from asserting their claims by some kind of wrongful conduct on the part of the defendant. In the second, extraordinary circumstances beyond plaintiffs' control made it impossible to

---

discrimination for the complainant to review and to verify, once the allegations have been clarified.").

file the claims on time." Harris v. Hutchinson, 209 F.3d 325, 330 (4th Cir. 2000) (internal quotation marks omitted).

Fulmore does not contend that wrongful conduct by the City prevented him from timely filing his EEOC Charge. Thus, he must satisfy the "extraordinary circumstances" test. This requires "(1) extraordinary circumstances, (2) beyond [the plaintiff's] control or external to his own conduct, (3) that prevented him from filing on time." Rouse v. Lee, 339 F.3d 238, 246 (4th Cir. 2003) (en banc). The Fourth Circuit has cautioned that "any resort to equity must be reserved for those rare instances where — due to circumstances external to the party's own conduct — it would be unconscionable to enforce the limitation period against the party and gross injustice would result." Harris, 209 F.3d at 330.

Courts in this circuit have routinely held that actions or omissions by the EEOC may justify equitable tolling under appropriate circumstances. See, e.g., Waiters v. Robert Bosch Corp., 683 F.2d 89, 92 (4th Cir. 1982) (permitting tolling where the plaintiff promptly filed his charge with the EEOC but because the EEOC lost his file (due to a burglary) and spent months searching for it, certain deadlines applicable to "deferral states" were not met); Morris v. Lowe's Home Ctrs., Inc., No. 1:10-CV-388, 2011 WL 2417046, at *3-*5 (M.D.N.C. June 13, 2011) (permitting tolling where the EEOC's repeated

delays of the plaintiff's interview with EEOC staff caused the plaintiff's charge to be untimely); Ijames v. Murdock, No. 1:01-CV-93, 2003 WL 1533448, at *3-*4 (M.D.N.C. Mar. 21, 2003) (holding that limited discovery was necessary to determine whether an EEOC investigator had refused to allow the plaintiff to file a timely charge when he attempted to do so, an incident that might justify tolling); Westry v. N.C. A & T, No. 1:01-CV-1129, 2002 WL 1602451, at *2-*3 (M.D.N.C. June 10, 2002) (permitting tolling where the EEOC, in violation of its own regulations, failed to refer the plaintiff's charge to the appropriate state agency, leading to a missed deadline); Zakeri v. Oliver, 19 F. Supp. 2d 553, 557-58 (E.D. Va. 1998) (same); cf. Crabill v. Charlotte Mecklenburg Bd. of Educ., Nos. 10-1539, 10-1553, 2011 WL 1491230, at *5-*7 (4th Cir. Apr. 20, 2011) (unpublished opinion) (holding that the district court's tolling of the limitations period was not an abuse of discretion, where the plaintiff diligently checked her mail and stayed in contact with her attorney but never received the "Right to Sue Letter" mailed to her by the EEOC and learned about the letter only after the 90-day limitations period for filing a lawsuit had passed).

On the other hand, where the plaintiff is at least partly responsible for the delay or does not diligently pursue his legal rights, tolling is generally not permitted. See, e.g.,

Edelman v. Lynchburg Coll., 228 F.3d 503, 511 (4th Cir. 2000) (refusing to allow tolling to save the plaintiff's untimely charge based upon EEOC delay in preparing the charge where (1) the plaintiff was represented by counsel throughout the administrative process, (2) he waited five months into the applicable 300-day limitations period before even contacting the EEOC, and (3) the EEOC mailed him the draft charge within the limitations period but he took too long signing and returning it), rev'd on other grounds, 535 U.S. 106 (2002); Citicorp Person-to-Person Fin. Corp. v. Brazell, 658 F.2d 232, 234-35 (4th Cir. 1981) (refusing to allow tolling based on the EEOC's failure to refer the plaintiff's charge to the appropriate state agency, which led to a missed deadline, because the plaintiff had (mistakenly) told the EEOC that she had already sent a charge to the state agency); Vaughn v. Wal-Mart, No. 4:10-CV-31, 2010 WL 4608403, at *5 (W.D. Va. Nov. 12, 2010) (holding that a single phone call to the EEOC after not hearing from the agency for two months would not constitute sufficiently diligent follow-up to justify tolling, even if EEOC delay were responsible for the plaintiff's untimely charge (which the plaintiff did not clearly allege)).[11]

---

[11] Variations of these general principles — requiring a greater or lesser showing from the plaintiff, as the case may be — can be found in other circuits. See, e.g., Ramirez v. City of San Antonio, 312 F.3d 178, 184 (5th Cir. 2002) (holding on summary judgment that "[i]t is not sufficient for [plaintiff] to show that the EEOC failed to give

Though the City urges that tolling should not apply, it has not addressed whether, and to what extent, a claimant who has invoked the machinery of the EEOC subsequently has an obligation independent of the Commission to file a charge. Nor has the court found any conclusive authority on this point. Cf. 42 U.S.C. § 2000e-5(b) (noting simply that the EEOC's investigative mechanisms under Title VII are engaged "[w]henever a charge is filed by or on behalf of a person claiming to be aggrieved, or by a member of the Commission"); 29 C.F.R. § 1601.6(a) ("The [EEOC] shall receive information concerning alleged violations of [T]itle VII . . . from any person. Where the information

---

him some relevant information; he must demonstrate that the EEOC gave him information that was affirmatively wrong"); Lawrence v. Cooper Cmtys., Inc., 132 F.3d 447, 451-52 (8th Cir. 1998) (permitting tolling where "[b]ased upon the EEOC's instructions and its interpretation of the charge filing procedures, [plaintiff] reasonably believed that she had taken all of the required steps to activate the Title VII statutory machinery"); Gray v. Phillips Petrol. Co., 858 F.2d 610, 616 (10th Cir. 1988) (permitting tolling where the EEOC "misled or at least lulled plaintiffs into inaction"); Grimm v. Target, No. 09-CV-93, 2009 WL 1508768, at *1-*3 (W.D. Pa. May 27, 2009) (adopting magistrate judge's recommendation that plaintiff "enjoy an opportunity to take full discovery in support of the equitable tolling theory," where the EEOC lost two successive questionnaires, the plaintiff maintained contact with the agency, and an EEOC investigator admitted that the delay was not the plaintiff's fault); Jacobs v. SUNY at Buffalo Sch. of Med., 204 F. Supp. 2d 586, 590-93 (W.D.N.Y. 2002) (permitting tolling where the plaintiff contacted the EEOC well within the limitations period, followed the EEOC's instructions to complete a charge questionnaire and wait for the EEOC to draft the charge, and "continued to make inquiries on the progress of her claims," but the EEOC by its own admission failed to timely prepare the charge); Todesco v. Durkee Foods, No. 87 C 720, 1987 WL 19225, at *1-*2 (N.D. Ill. Oct. 16, 1987) (permitting tolling where the plaintiff relied upon an EEOC officer's assurance that a charge form would be sent to him for signing but the form was not sent until after the limitations period had ended).

discloses that a person is entitled to file a charge with the [EEOC], the appropriate office *shall render assistance* in the filing of a charge." (emphasis added)). Compare Thibodeaux v. Transit Mix Concrete & Materials Co., 3 F. Supp. 2d 743, 746 (E.D. Tex. 1998) ("After the complainant submits the initial information, control over the timing of the filing of a formal charge of discrimination lies solely in the hands of the [C]ommission."), id. at 746 n.1 (noting that this interpretation was "confirmed by the Houston office of the EEOC"), and id. at 746 n.2 ("[The plaintiff] . . . cannot file a formal charge of discrimination absent the EEOC's determination the charge is warranted."), with Nadesan v. Tex. Oncology PA, No. 2:10-CV-239, 2011 WL 147570, at *6 (N.D. Tex. Jan. 18, 2011) ("Although [the plaintiff] did not receive a formal charge from the EEOC to sign until . . . approximately 195 days after she submitted her Intake Questionnaire, and after the 300-day filing deadline had passed, nothing prevented [her] from completing a formal charge and submitting it to the EEOC." (refusing to toll at the summary judgment stage, and noting that the plaintiff had been assisted by counsel through the whole process and did not claim that she had attempted to contact the EEOC to check on her case's status)).

In the absence of any authority advanced by the City and given the apparent lack of a clear rule putting the onus on an

aggrieved party to ensure the timely filing of a charge once he invokes the EEOC's assistance, the court finds that Fulmore has plausibly alleged equitable tolling in the SAC and attached Intake Questionnaire. The SAC alleges that Fulmore submitted his Intake Questionnaire on August 1, 2005, that he "intended the EEOC to take prompt action against the City" at that time, that "[t]he EEOC delayed in preparing the Charge of Discrimination for Officer Fulmore to sign until June 1, 2006," and that he signed the Charge on June 1, 2006. (Doc. 23 ¶¶ 225-26, 245-46.) A reasonable inference is that he intended to engage the mechanisms of the EEOC charge-filing process when he submitted his Intake Questionnaire, and there is no indication that he was responsible for the EEOC's delay. Cf., e.g., Brazell, 658 F.2d at 234-35 (denying tolling where information provided by the plaintiff caused the EEOC's mistake). The instructions on his Intake Questionnaire support this inference. They state that "to complete the process of filing a charge," the applicant must (1) complete the Intake Questionnaire and (2) be interviewed by an Intake Officer.[12] (Doc. 24 at 1.) The instructions provide further that "it could take up to 2-4 hours for you to complete the entire process of filing a charge,

---

[12] Fulmore does not specifically allege that he was interviewed by an Intake Officer, but it is a reasonable inference at this stage that the interview took place, because the EEOC ultimately drafted Fulmore's Charge.

including interviewing with an Intake Officer."[13] (Id. (emphasis omitted).) The Privacy Act Statement on page nine of the Intake Questionnaire also advises that the information on the form will "enable the [EEOC] to act on matters within its jurisdiction." (Id. at 9.) On this record, therefore, Fulmore could reasonably have understood the EEOC's instructions on the Intake Questionnaire to require no further action by him once he completed these two items because the EEOC would thereafter bear responsibility for drafting his Charge and otherwise handling his case. Consequently, equitable tolling may be appropriate. Cf. Gray v. Phillips Petrol. Co., 858 F.2d 610, 616 (10th Cir. 1988) (permitting tolling where the EEOC "misled or at least lulled plaintiffs into inaction").[14]

The result of the court's ruling is that any otherwise-valid claims arising on or after February 2, 2005 — 180 days

---

[13] The court has not located another federal opinion mentioning this particular version of the form instructions for an intake questionnaire. It appears that the EEOC has used many different variations of this questionnaire. See, e.g., Memorandum in Opposition to Motion to Dismiss, Exhibit 2, at 1-2, Beckham v. Nat'l R.R. Passenger Corp., 590 F. Supp. 2d 82 (D.D.C. 2008) (No. 08-CV-172) (displaying a questionnaire form dramatically different from Fulmore's form); Plaintiff's Opposition to Defendant's Motion to Dismiss, Exhibit A, at 2-4, Hodge v. United Airlines, No. 08-CV-232 (D.D.C. July 28, 2008) (displaying a questionnaire form significantly different from both Fulmore's form and the form in Beckham); cf. Holowecki, 552 U.S. at 414 n.4 (Thomas, J., dissenting) (describing differences between the questionnaire form in Holowecki and another version of the form).

[14] At the hearing, Fulmore's counsel argued for such a reliance theory. He said that the EEOC "[d]idn't do what they should have done on time, [Fulmore] relied upon them to do it on time, *they said that they would investigate it*" (emphasis added).

before the submission of the Intake Questionnaire on August 1, 2005 — will proceed at this stage. Ultimately, of course, the burden will rest on Fulmore to establish that equitable tolling is indeed justified on the facts of this case and, if so, that the entire period between the Intake Questionnaire and the Charge (rather than only a portion of it) should be tolled. See, e.g., DiPaulo v. Potter, 733 F. Supp. 2d 666, 673 (M.D.N.C. 2010) ("The burden of showing facts to justify tolling rests with [the plaintiff]."); Lizarbe v. Rondon, 642 F. Supp. 2d 473, 480 (D. Md. 2009) ("Plaintiffs, who have the burden of proof on the issue, contend that equitable tolling should apply." (footnote call number omitted)), aff'd in part and appeal dismissed in part on other grounds, 402 F. App'x 834 (4th Cir. 2010) (unpublished per curiam opinion). All claims arising before February 2, 2005, are clearly time barred and will be dismissed.

### b. The Intake Questionnaire as Charge

It is unnecessary to address at this time Fulmore's alternative argument that his Intake Questionnaire constituted a sufficient charge of discrimination under the standard set forth in Federal Express Corp. v. Holowecki, 552 U.S. 389 (2008), because this argument, even if successful, would produce the same result as the court's equitable tolling holding.

## 2. Fulmore's Theories of Discrimination and the Plausibility Standard

The City contends that even if tolling is permitted, Fulmore's SAC does not allege facts plausibly supporting any Title VII claims arising on or after February 2, 2005. Fulmore argues that he has adequately alleged racial discrimination during that time period under three different theories: (1) disparate treatment, (2) failure to promote,[15] and (3) hostile work environment. Each of these theories will be discussed in turn.

### a. Disparate Treatment

To make out a prima facie disparate treatment claim in the employment setting, Fulmore must establish that (1) he is a member of a protected class, (2) he suffered an adverse employment action, (3) he was performing in a manner that satisfied his employer's legitimate job expectations, and (4) the adverse employment action occurred "under circumstances which give rise to an inference of unlawful discrimination." Jenkins v. Trs. of Sandhills Cmty. Coll., 259 F. Supp. 2d 432, 443 (M.D.N.C. 2003) (quoting EEOC v. Sears Roebuck & Co., 243 F.3d 846, 851 n.2 (4th Cir. 2001)), aff'd, 80 F. App'x 819 (4th

---

[15] Failure to promote is a special form of disparate treatment. See, e.g., Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 268 (4th Cir. 2005) (discussing the requirements of a "disparate treatment claim for failure to promote"). However, both parties discuss failure to promote separately, so this opinion will do so as well.

Cir. 2003) (unpublished per curiam opinion); see Holland v. Wash. Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007).

While Fulmore need not allege facts that constitute a prima facie case at the Rule 12(b)(6) stage, see Jordan, 458 F.3d at 346, he must still "allege facts sufficient to state all the elements of [his] claim," id. (emphasis omitted) (quoting Bass, 324 F.3d at 765). A key element that Fulmore must allege is that he suffered an "adverse employment action." See Harman v. Unisys Corp., 356 F. App'x 638, 641 (4th Cir. 2009) (unpublished per curiam opinion) (citing Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981) (en banc)); Hoffman v. Balt. Police Dep't, 379 F. Supp. 2d 778, 792 (D. Md. 2005) ("It is well settled that to state a cause of action for disparate treatment under Title VII . . . the plaintiff must allege that he suffered an 'adverse employment action.'"); cf. Fletcher v. Philip Morris USA Inc., No. 3:09-CV-284, 2009 WL 2067807, at *5-*6 (E.D. Va. July 14, 2009) (analyzing, in the context of a disparate treatment claim under Title VII, whether the plaintiff sufficiently alleged an adverse employment action).

An "adverse employment action" is "a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" Holland, 487 F.3d at 219 (alteration in original) (quoting James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004)). While

"[c]onduct short of ultimate employment decisions can constitute adverse employment action," James, 368 F.3d at 375-76 (quoting Von Gunten v. Maryland, 243 F.3d 858, 865 (4th Cir. 2001), abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)) (internal quotation marks omitted), the "typical requirements for a showing of an 'adverse employment action'" are "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion," Boone v. Goldin, 178 F.3d 253, 255 (4th Cir. 1999). For example, "a poor performance evaluation 'is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment.'" James, 368 F.3d at 377 (quoting Spears v. Mo. Dep't of Corr. & Human Res., 210 F.3d 850, 854 (8th Cir. 2000)). "An evaluation merely causing a loss of prestige or status is not actionable." Id.

The only clearly alleged actions taken against Fulmore on or after February 2, 2005, are (1) multiple investigations (i.e., the investigation that ended in March 2005 (Doc. 23 ¶¶ 170, 180-81, 202-05) and the subsequent investigation that commenced in March 2005, which allegedly involved surveillance

by a private detective (id. ¶¶ 211-18)) and (2) Fulmore's March 2005 reassignment to patrol division (id. ¶¶ 206-09).[16]

The investigations did not constitute "adverse employment actions" supporting a disparate treatment claim. See, e.g., Dawson v. Rumsfeld, No. 1:05-CV-1270, 2006 WL 325867, at *6 (E.D. Va. Feb. 8, 2006) (inferring from Fourth Circuit case law that "the mere decision to initiate an investigation is not an adverse employment action" and holding that the supervisor's decision to fingerprint the plaintiff following theft of property was not an adverse employment action); Hoffman, 379 F. Supp. 2d at 792 (stating, in response to a "disparate investigation" claim, that "[t]he few courts that have considered whether an investigation, by itself, can constitute

---

[16]  Other potentially timely allegations are too vague and lacking in facts to support a disparate treatment claim.  The SAC states that one of the three alleged "Black Books" was created around February 2005 (Doc. 23 ¶¶ 194-201), but as noted above, it is unclear whether Fulmore's photo was even included.  See supra note 1.  Even if it was, there is no indication in the SAC that the creation or use of the "Black Book" affected the terms, conditions, or benefits of Fulmore's employment, so it was not an "adverse employment action."  Similarly, although the other photo lineups were allegedly used sometime during 2005 and allegedly included Fulmore's photo (see Doc. 23 ¶¶ 68-80), Fulmore does not allege facts indicating that the terms, conditions, or benefits of his employment were thereby affected.  Finally, the alleged attempts to sell stolen property to Fulmore at his auto body shop during his suspension may have lasted until March 2005 (see id. ¶¶ 181-93), but there is no connection between this allegation and the terms, conditions, or benefits of Fulmore's employment.

an adverse employment action have answered that question in the negative" (emphasis omitted)).[17]

As for the reassignment, the Fourth Circuit has held that a reassignment constitutes an "adverse employment action" only if the reassignment has a "significant detrimental effect" on the plaintiff. Boone, 178 F.3d at 256. "[E]ven if the new job . . . cause[s] some modest stress not present in the old position," reassignment to a new position "commensurate with one's salary level" is not an "adverse employment action" unless there is a "decrease in compensation, job title, level of responsibility, or opportunity for promotion." Id. at 256-57. Here, Fulmore calls the patrol position "a lesser position" (Doc. 23 ¶ 208) and states that he was reassigned "purportedly as punishment for [a] minor administrative violation" (id. ¶ 206). However, he alleges nothing else about the reassignment or his new position, and no facts alleged in the SAC indicate that the reassignment had a "significant detrimental effect" on him. He also fails to allege facts showing that the reassignment caused a "decrease in compensation, job title, level of responsibility, or opportunity for promotion." (The SAC contains one passing reference to

---

[17] An investigation may be a sufficient adverse action in the context of a retaliation claim. See Hetzel v. Cnty. of Prince William, 89 F.3d 169, 171-72 (4th Cir. 1996); cf. Williams v. Hansen, 326 F.3d 569, 585 n.1 (4th Cir. 2003) (King, J., dissenting) (citing Hetzel in the context of an equal protection claim). However, the definition of "adverse action" in the retaliation context is broader than the definition of "adverse employment action" in the disparate treatment context. See White, 548 U.S. at 67.

"reassignment with significantly different and inferior responsibilities" (id. ¶ 257) but no explanation or factual basis is provided.) In his brief, while discussing his failure-to-promote claim, Fulmore calls the reassignment a "discriminatory demotion" and states that because of it, "he lost the ability to even apply for promotions to numerous positions." (Doc. 30 at 20.) However, Fulmore alleges no specific facts supporting this, and the SAC itself makes no connection between the reassignment and any loss of promotional opportunity. Moreover, Fulmore's brief does not spend any more time discussing the reassignment. Therefore, the court finds that Fulmore's alleged reassignment to patrol division fails to plausibly support a disparate treatment claim.

Fulmore contends that events occurring before February 2, 2005, should be considered by the court under a continuing violation theory, because the actions allegedly taken against him by the GPD leadership were part of a single discriminatory pattern of "systemic and serial" mistreatment. (Id. at 12.) He argues that he has alleged a timely "Title VII claim based on disparate treatment due to racially discriminatory policies and customs." (Id.)

"The continuing violation theory allows for consideration of incidents that occurred outside the time bar when those incidents are part of a single, ongoing pattern of

discrimination, i.e., when the incidents make up part of a hostile work environment claim." Holland, 487 F.3d at 219. However, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Morgan, 536 U.S. at 113. To the extent Fulmore asserts a single claim based upon a pattern of harassment and discriminatory treatment in his employment, this will be treated as a hostile work environment claim and will be addressed separately. To the extent Fulmore contends that discrete acts occurring before February 2, 2005, support disparate treatment claims because they are part of the same pattern of discrimination as acts occurring on or after February 2, 2005, the contention is not supported by case law. See Williams v. Giant Food Inc., 370 F.3d 423, 429 (4th Cir. 2004) (agreeing with "other courts [that] have declined to extend the limitations periods for discrete acts of discrimination merely because the plaintiff asserts that such discrete acts occurred as part of a policy of discrimination"); id. at 430 ("We see no reason why the general rule set out in *Morgan* should not apply to . . . separate [failure to promote] incidents just because [plaintiff] alleges, in a general sense, that there was a 'pattern or practice' of discrimination.").

Finally, Fulmore argues that his suspension, at least, supports a disparate treatment claim, even though it began in

early June 2004, because it lasted until March 2005 and thus fell partly within the applicable limitations period. (See Doc. 23 ¶ 181.) However, "[a] Title VII plaintiff must show a 'present violation' within the limitations period. . . . For disparate-treatment claims — and others for which discriminatory intent is required — that means the plaintiff must demonstrate deliberate discrimination within the limitations period." Lewis v. City of Chi., Ill., 130 S. Ct. 2191, 2199 (2010) (citation omitted). The decision to suspend Fulmore was made in June 2004, well outside the applicable limitations period. Fulmore does not allege any deliberate discriminatory action taken against him in connection with his suspension between February 2, 2005, and the termination of his suspension in March 2005. The failure to reverse the suspension between February 2, 2005, and March 2005 — mere nonaction — cannot support a disparate treatment claim. See, e.g., Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 628-29 (2007) (rejecting the plaintiff's argument that a new Title VII violation had occurred where disparate pay was received during the limitations period but the intentionally discriminatory pay decision occurred outside the limitations period);[18] Del. State Coll. v. Ricks, 449 U.S. 250,

---

[18] The specific holding in Ledbetter was superseded by the Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5 (codified at 42 U.S.C. § 2000e-5(e)(3) and elsewhere). The Act only applies to discriminatory compensation claims, however, so the reasoning and analysis in Ledbetter remains valid as to other types of

43

257-58 (1980) (holding that plaintiff professor's Title VII claim for discriminatory denial of tenure was untimely where the denial was made and communicated to him outside the limitations period even though the employment actually ended within the limitations period, and noting that "the proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts became most painful" (emphasis in original)); <u>Int'l Union of Elec. Workers, Local 790 v. Robbins & Myers, Inc.</u>, 429 U.S. 229, 234-35 (1976) (holding that the date of plaintiff's discharge started the limitations period running, even though grievance-arbitration procedures continued that could have led to her reinstatement).

At the hearing, Fulmore's counsel asserted that a suspension with pay pending an investigation is distinguishable from termination and constitutes a single extended act that accrues once the investigation concludes and the suspension ends. Counsel did not provide any authority or additional arguments for this distinction between paid suspension and "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire," <u>Morgan</u>, 536 U.S. at 114, and

---

claims. <u>See, e.g.</u>, <u>Tryals v. AltairStrickland, LP</u>, No. 08-CV-3653, 2010 WL 743917, at *7 (S.D. Tex. Feb. 26, 2010) ("The Fair Pay Act of 2009 only affects the *Ledbetter* decision with respect to the timeliness of discriminatory compensation claims. . . . The rule set out in *Ledbetter* . . . is still binding law for Title VII disparate treatment cases involving discrete acts other than pay." (citations omitted)).

it is unclear why an employee who is merely suspended with pay should enjoy a more favorable rule than one who is actually terminated.[19]

For the foregoing reasons, Fulmore's disparate treatment claims will be dismissed for failure to state a claim.

### b. Failure to Promote

A failure-to-promote claim comprises the following elements: (1) the plaintiff is a member of a protected group; (2) his employer had an open position for which he applied; (3) he was qualified for the position; and (4) he was rejected under circumstances supporting an inference of unlawful discrimination. See Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 268 (4th Cir. 2005); see also, e.g., Cepada v. Bd. of Educ., No. 10-CV-0537, 2011 WL 1636405, at *4 (D. Md. Apr. 28, 2011) (applying this framework in the Rule 12(b)(6) context). Alternatively, a plaintiff need not have applied for the position if he can show that the employer's promotions policy was "informal and subjective" or "vague and secretive,"

---

[19] Even if Fulmore's June 2004 suspension could be considered, it would not constitute an "adverse employment action" supporting a disparate treatment claim, because Fulmore has not alleged facts plausibly showing a connection between his suspension and any detrimental effects upon the terms, conditions, or benefits of his employment. Cf., e.g., Locklear v. Person Cnty. Bd. of Educ., No. 1:05-CV-255, 2006 WL 1743460, at *6 (M.D.N.C. June 22, 2006) ("[Plaintiff] has not alleged that she would have lost pay or job rank as a result of the suspension with pay. Therefore, the Court cannot find that the suspension with pay affected the terms, conditions, or benefits of her employment.").

Westry v. N.C. A & T State Univ., 286 F. Supp. 2d 597, 603 (M.D.N.C. 2003), aff'd, 94 F. App'x 184 (4th Cir. 2004) (unpublished per curiam opinion); if the employer failed to make its employees aware of vacancies, Williams, 370 F.3d at 431; or if the employee demonstrates that the employer "consistently discriminated when making promotion decisions," such that the employee's application would have faced "certain rejection," Westry, 286 F. Supp. 2d at 603.

The SAC does not allege any specific instance on or after February 2, 2005, in which Fulmore applied for a GPD position and was rejected. Fulmore points to several general assertions in the SAC that he and other black GPD officers were denied promotional opportunities, but these statements are all conclusory. (See, e.g., Doc. 23 ¶ 38 ("Wray created and developed a pattern and practice of . . . paying and promoting black officers, including Officer Fulmore, less favorably, than white officers in the GPD."); id. ¶ 257 ("As a result of the hostile work environment, Officer Fulmore suffered adverse tangible employment actions, including . . . loss of timely promotions . . . and loss of opportunities to serve on additional task forces . . . ."); id. ¶ 277 ("Officer Fulmore was intentionally subjected to . . . reduced promotional opportunities, pay and privileges . . . .").)

_Twombly_ and _Iqbal_ require more than such "labels and conclusions" — they require sufficient _factual_ allegations "to raise a right to relief above the speculative level" so as to "nudge[] the[] claims across the line from conceivable to plausible." _Twombly_, 550 U.S. at 555, 570; _see Iqbal_, 129 S. Ct. at 1949-51. Therefore, Fulmore's failure-to-promote claim will be dismissed for failure to state a claim.

### c. Hostile Work Environment

Though the City previously moved to dismiss the hostile work environment claim contained in Fulmore's earlier Amended Complaint, the City has abandoned its arguments as to this claim in the current briefing. (_See_ Doc. 31 at 7 n.4.) Thus, Fulmore's hostile work environment claim (which relies upon a continuing violation theory to render it timely) will proceed.

### 3. Defense of Laches

The City contends that Fulmore's Title VII claims are barred by laches because the delay between the earlier alleged discrimination (dating back to 2003 and 2004) and Fulmore's June 2006 EEOC Charge was unreasonable. The City contends that it was prejudiced because it was deprived of the opportunity to remedy the alleged discrimination. Fulmore argues that the City had notice of the discrimination far earlier than June 2006 and, in any event, the City's laches argument is inappropriate at the Rule 12(b)(6) stage because it involves a fact-bound inquiry.

"Employers have recourse when a plaintiff unreasonably delays filing a charge." <u>Morgan</u>, 536 U.S. at 121. One such remedy is the equitable defense of laches, "which bars a plaintiff from maintaining a suit if he unreasonably delays in filing a suit and as a result harms the defendant." <u>Id.</u> This defense "requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." <u>Id.</u> at 121-22. Such equitable doctrines "allow [the courts] to honor Title VII's remedial purpose without negating the particular purpose of the filing requirement, to give prompt notice to the employer." <u>Id.</u> at 121 (internal quotation marks omitted).

Laches is an affirmative defense, however, <u>see</u> <u>White v. Daniel</u>, 909 F.2d 99, 102 (4th Cir. 1990), and "a motion to dismiss filed under [Rule 12(b)(6)], which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense." <u>Goodman v. Praxair, Inc.</u>, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); <u>cf.</u> <u>Fed. Express Corp. v. U.S. Postal Serv.</u>, 75 F. Supp. 2d 807, 814 (W.D. Tenn. 1999) ("As evaluation of a claim of laches is dependent upon the submission of evidence, [Rule 12(b)(6)] is not the proper vehicle for bringing such a request."). An affirmative defense may only be reached at the Rule 12(b)(6) stage "if all facts necessary to the affirmative defense 'clearly appear[] on the face of the

complaint.'" Goodman, 494 F.3d at 464 (alteration in original) (emphasis omitted) (quoting Richmond, Fredericksburg & Potomac R.R. Co. v. Forst, 4 F.3d 244, 250 (4th Cir. 1993)).

The RMA Report incorporated into the SAC alleges that the City Manager was made aware of alleged racial discrimination within the GPD in June 2005, the City Attorney subsequently conducted an investigation (which included forty interviews by mid-October 2005), the City retained RMA to investigate the GPD in November 2005, and RMA issued its report in December 2005. (Doc. 25 at 6-8.)  The report contained multiple references to investigations of Fulmore (see id. at 7, 17-18, 26, 30), and the City allegedly accepted Wray's and Brady's resignations as a result of the report (Doc. 23 ¶ 238).  Therefore, not only is it not clear from the face of the SAC that the City lacked notice of Fulmore's allegations until June 2006 and had no opportunity to address them before that date, the opposite appears true. Moreover, the SAC does not make clear that Fulmore failed to diligently pursue his claims, that any delay by him was unreasonable, or that any delay prejudiced the City so as to require that his claims be barred as a matter of equity.

The City argues that the SAC does not allege that it had notice of Fulmore's *specific* allegations and claims prior to June 2006.  Insofar as laches is an affirmative defense, however, the relevant inquiry is whether the SAC clearly shows

that the City *did not* have such notice and was thereby prejudiced. Because this is not clear from the face of the SAC, the City's motion to dismiss Fulmore's remaining Title VII claim on this basis will be denied without prejudice.[20]

### 4. Scope of the EEOC Charge

The City's final argument is that Fulmore's claims exceed the scope of his EEOC Charge and should therefore be dismissed for failure to exhaust administrative remedies. Because his hostile work environment claim is his only remaining Title VII claim, this issue need only be decided as to that claim.

"[F]ailure by the plaintiff to exhaust administrative remedies concerning a Title VII claim deprives the federal courts of subject matter jurisdiction over the claim." <u>Jones</u>,

---

[20] The City's reliance upon <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998), and <u>Indest v. Freeman Decorating, Inc.</u>, 164 F.3d 258 (5th Cir. 1999) (Jones, J.) (nonprecedential opinion for lack of concurrences), is misplaced. These opinions address the principle that a hostile work environment must be imputable to the employer for Title VII liability to follow. <u>Faragher</u> held that an employer is vicariously liable for a hostile work environment "created by a supervisor with immediate (or successively higher) authority over the employee." 524 U.S. at 807. But <u>Faragher</u> also provided an affirmative defense where the employer establishes by a preponderance of the evidence that it "exercised reasonable care to prevent and correct promptly" any harassment and the employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." <u>Id.</u> The City has not argued for this affirmative defense and, as noted, has abandoned any merits-based arguments against Fulmore's hostile work environment claim at this stage. Therefore, <u>Faragher</u> does not apply. <u>Indest</u>, which articulated a variation on the <u>Faragher</u> holding, <u>see Indest</u>, 164 F.3d at 264-67, is similarly inapplicable to a laches defense. To the extent the City argues that laches should apply because Fulmore's alleged delay has prevented it from invoking the <u>Faragher</u> affirmative defense, this argument fails for the reason noted above (i.e., that laches must clearly appear on the face of the SAC).

551 F.3d at 300. The scope of a Title VII action is not strictly limited by the scope of the preceding administrative charge of discrimination; rather, the suit is "confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination." Chisholm v. U.S. Postal Serv., 665 F.2d 482, 491 (4th Cir. 1981). It is a "generally accepted principle [in the Fourth Circuit] that the scope of a Title VII lawsuit may extend to any kind of discrimination like or related to allegations contained in the charge and growing out of such allegations during the pendency of the case before the Commission." Nealon v. Stone, 958 F.2d 584, 590 (4th Cir. 1992) (quoting Hill v. W. Electric Co., 672 F.2d 381, 390 n.6 (4th Cir. 1982)) (internal quotation marks omitted). "[T]hose discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." Jones, 551 F.3d at 300 (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 963 (4th Cir. 1996)). On the other hand, "a claim in formal litigation will generally be barred if the EEOC charge alleges discrimination on one basis, such as race, and the formal litigation claim alleges discrimination on a separate basis, such as sex." Id.

Fulmore's Charge reads, in pertinent part, as follows:

Since 2005 and continuing, I and all other Black
Police Officers in the Greensboro Police Department
have been intimidated and subjected to different terms
and conditions of employment. In 2005, it became
known that Chief Wray, Chief of Greensboro Police
Department maintained a "Black Book" that negatively
portrayed Black Police Officers.

In addition to the above, since January 2006, I have
filed numerous complaints with the Internal Affairs
Division concerning various incidents, which lead me
to believe that I am a subject of surveillance and is
part of the continuing harassment and intimidation.
In spite of Departmental policies and procedures, my
complaints have not been investigated or resolved.

I believe that I have been discriminated against
because of my race, Black, in violation of Title VII
of the Civil Rights Act of 1964, as amended.

(Doc. 26 at 1.)

The City argues that the Charge only specifically mentions
the "Black Book" and certain failures of the Internal Affairs
Division to respond to Fulmore's complaints and thus all other
discriminatory acts alleged in the SAC exceed the scope of the
Charge. The City points to Dennis, 55 F.3d at 156, where the
Fourth Circuit held that several Title VII claims were barred
because they exceeded the scope of the plaintiff's EEOC charge.

Both the Charge and the SAC allege the same basis for
discrimination, that is, race. (See, e.g., Doc. 23 ¶¶ 264-65,
278.) Moreover, the Charge generally alleges "continuing
harassment," which signals a hostile work environment claim.
Several potential components of the alleged hostile work

environment are clearly related to the Charge allegations. For example, the Charge alleges that Fulmore "believe[s] that [he is] a subject of surveillance." (Doc. 26 at 1.) The SAC's allegations of multiple investigations involving surveillance of Fulmore are reasonably related to the Charge allegation and to the "administrative investigation that can reasonably be expected to follow," Chisholm, 665 F.2d at 491. Similarly, the SAC's allegations of three photo arrays containing photos of black officers (at least two of which allegedly contained Fulmore's photo) are reasonably related to the Charge's "Black Book" allegation.

The court finds that Fulmore's hostile work environment claim is reasonably related to the original Charge. It is not necessary that the Charge explicitly mention each alleged action that may be used by Fulmore to support his hostile work environment claim. The City's reliance on Dennis is misplaced, moreover, because the charge there alleged only a discriminatory discipline claim, 55 F.3d at 153, so the plaintiff's discriminatory hiring, failure-to-promote, and discriminatory training claims were clearly beyond the charge's scope, see id. at 156. Here, only Fulmore's hostile work environment claim survives, and his Charge adequately gave notice of such a claim. Thus, the City's motion to dismiss on this basis will be denied.

**III. CONCLUSION**

For the reasons set forth above, therefore,

IT IS ORDERED that Defendant City of Greensboro's Motion to Dismiss Second Amended Complaint (Doc. 27) is GRANTED IN PART AND DENIED IN PART:

(1) The motion is GRANTED as to Plaintiff Julius Fulmore's 42 U.S.C. § 1983 claim for violation of his rights under 42 U.S.C. § 1981 (Count II) and his Title VII claims for disparate treatment and failure to promote (Count I in part), which are DISMISSED WITH PREJUDICE pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim;

(2) The motion is DENIED as to Plaintiff Julius Fulmore's Title VII claim for hostile work environment (Count I in part).


_/s/   Thomas D. Schroeder_
United States District Judge

July 6, 2011